[No. C. D. 3602.    *En Banc.*    September 17, 1959.]

*In the Matter of Disciplinary Proceedings Against*
JAMES B. CARROLL, *an Attorney at Law.*[1]

[1]Reported in 343 P. (2d) 1023.

T. M. ROYCE, for board of governors.

DONWORTH, J.—The Washington state bar association, by its complaint, verified by its president, charged respondent, James B. Carroll, who was admitted to the practice of law by this court on August 25, 1950 (and thereafter practiced law in Seattle), with appropriating to his own use the sum of $2,500 belonging to a client, Donald W. Rogers, and with failing to prosecute the personal injury claim of another client, C. Joseph Booth, by whom respondent had been retained.

Pursuant to Rule for Discipline of Attorneys 13, 34A Wn. (2d) 185, a copy of the complaint, together with a notice requiring him to appear and answer the complaint within ten days after service of the documents, was personally served upon respondent in King county on January 26, 1958.

Thereafter, on April 2, 1958, respondent acknowledged service of a trial amendment charging him with appropriating to his own use the sum of $812.50 belonging to another client, Marlys Daily.

Respondent filed no answer to the formal complaint or to the trial amendment. Rule for Discipline of Attorneys 33, 34A Wn. (2d) 193, provides that, if no answer to the formal complaint is filed within ten days, the respondent attorney is entitled to no further notice.

Nevertheless, notice of further proceedings was given to respondent. A hearing on these charges before a trial committee composed of a member of the board of governors and two practicing attorneys was scheduled for May 16, 1958, in Seattle. Written notice thereof was given to respondent on April 8, 1958.

Respondent thereafter moved to California and, on May 4, 1958, wrote a letter to the association asking for a continuance until the fall. He gave as his address, 411 O'Farrell Street, Room 508, San Francisco, California. His motion was granted, and October 10, 1958, was fixed as the date

for the hearing. Notice of the new hearing date was mailed to him on May 13, 1958, and respondent acknowledged receipt thereof on May 14, 1958, by endorsing a copy of the notice.

Meanwhile, the term of office of the designated chairman as a member of the board of governors had expired and another member was appointed chairman of the trial committee. A letter to respondent, dated September 8, 1958, notifying him of this fact was returned unclaimed. Notice of the members of the trial committee and a reiteration of the new date of hearing was served on respondent by the sheriff of San Francisco county on September 30, 1958.

On October 6, 1958, respondent wrote a nine-page letter to the association, in which he stated in detail his attempts to obtain employment in San Francisco, and stated, in part, as follows:

"Because of my economic status I will not be able to appear at the hearing on October 10. My presence would add nothing to what is set forth in this letter. I cannot contest these proceedings; yet I categorically deny the allegations of the complaint as amended as they are set forth. Circumstances, however, have prevented me from making available to complaining parties funds which unquestionably belong to them. I repeat that I have every intention of making these funds available to the respective parties as soon as possible. . . .

"I do appreciate the understanding and opportunity to better the situation which I have been accorded to date. I expect no clemency in this matter, although I hope for it, since it is my sincere desire to engage again in the practice of law, sometime, someplace.

"I deeply regret the embarrassment which the Bar Association and its members have suffered as a result of this matter; I apologize to each member for my part in it and for my inability to do more than this. There is nothing I would not do to cure the situation."

With respect to the transaction described in the trial amendment (third item of complaint), Marlys Daily, subsequent to her dealings with respondent, married E. A. Kebodeaux and moved to North Dakota. Consequently, it

became necessary to take her deposition. Notice of the taking of her deposition was received by the sheriff of the city and county of San Francisco on October 3, 1958, but respondent could not be located there. A return of "not found" was made by the sheriff. However, in a letter dated October 8, 1958, to the association, respondent waived any further notice in the proceedings.

The trial committee held its hearing on October 10, 1958, and heard the testimony of the various witnesses. Respondent did not appear either in person or by counsel.

The committee made findings of fact substantially as follows:

"As to First Item of Complaint

" Donald W. Rogers, Complaining Witness"

In February, 1956, Mr. Rogers retained respondent as his attorney to represent him in the prosecution of a claim for personal injuries sustained by him as the result of an automobile accident. A contingent fee was agreed upon amounting to twenty-five per cent of the proceeds if settled out of court, and thirty-three and one third per cent thereof if the case proceeded to trial. In July, 1957, respondent succeeded in negotiating a settlement for $2,500, and a draft in that amount, payable to him and Mr. Rogers jointly, was issued by the insurance company involved. Respondent obtained Mr. Rogers' endorsement of the draft upon respondent's promise that, when the draft cleared, after deducting his fee, he would give Mr. Rogers $1,345 and pay the medical expenses. Respondent deposited the draft in his trust account at a Seattle bank, and it was promptly honored. On September 4, 1957, after many unjustified excuses to his client, respondent gave him his own check in the sum of $1,345, upon which payment was stopped by him two days later. Mr. Rogers was thereafter unable to locate respondent. None of the medical bills were paid by respondent, and the entire proceeds of the draft ($2,500) were appropriated by respondent and used for purposes not authorized by the terms of his trust. No part of the sum of $2,500 has been paid to, or for the use of, Mr. Rogers,

but the entire amount has been appropriated to respondent's use with the intent to deprive his client thereof. Respondent has made no restitution, except that Mr. Rogers, by means of a garnishment proceeding, has collected $67.30. The concluding sentence of the findings relating to the first item of complaint reads as follows:

"That while respondent by letter (Association Exhibit No. 16) offered, through the Washington State Bar Association, to give his note for the balance, he attached as a condition that the Washington State Bar Association obtain an agreement not to prosecute, which condition the Trial Committee has not accepted."

"AS TO SECOND ITEM OF COMPLAINT
"Joseph Booth, Complaining Witness"

About March 7, 1956, respondent was employed by the complaining witness as his attorney to prosecute a claim for personal injuries sustained by him. Mr. Booth delivered to respondent his entire file relating to the claim, including maps of the scene of the accident and medical reports. Respondent has retained these papers for more than two and one half years without doing any work whatsoever in the prosecution of the claim, and has failed, neglected, and refused to communicate with his client except for two meetings subsequent to their initial conference.

"THIRD ITEM OF COMPLAINT
"Marlys Daily, Complaining Witness"

In June, 1957, Mrs. Kebodeaux (then Marlys Daily) retained respondent as her attorney to prosecute a claim for personal injuries sustained by her. The terms of their agreement were that respondent should receive for his services twenty-five per cent of the amount recovered. A settlement was negotiated for the sum of $1,750, and respondent received a draft, dated August 22, 1957, in that amount, payable to the order of "Marlys Daily." Respondent induced his client to endorse the draft and return it to him on his promise that he would pay the hospital and doctor bills, deduct one fourth as his fee, and pay her the balance. The following day, respondent deposited the draft in his trust account at a Seattle bank, where it was promptly

honored, and, on August 25th, respondent paid Miss Daily $500, promising to pay her the balance by August 30th. Respondent has never paid any of the doctor or hospital bills (totalling $356), nor has he paid any further sum to his client. The hospital and the doctors have been, and still are, pressing Mrs. Kebodeaux for payment. The balance of the proceeds of the draft over and above the $500 paid to his client was appropriated and paid out by respondent for uses not authorized by the terms of his trust. Mrs. Kebodeaux has attempted to locate respondent since August 30, 1957, without success, and has had no communication from him. As a result of this transaction, respondent appropriated to his own use the sum of $862.50, the property of Mrs. Kebodeaux, with intent to deprive her thereof. Respondent has made no restitution, but did make the same offer (as he did regarding Mr. Rogers' complaint) to give his promissory note for the balance if the association would obtain an agreement from Mrs. Kebodeaux not to prosecute him. The trial committee has not accepted this condition.

As to the first and third items of complaint, the trial committee found that respondent was guilty of the commission of an act involving moral turpitude and dishonesty in the course of his relations as an attorney at law, in violation of Rule for the Discipline of Attorneys 10(6), 34A Wn. (2d) 183, and that he was also guilty of violating Canon of Professional Ethics 11, 34A Wn. (2d) 129, in that, for his personal benefit and gain, he abused and took advantage of the confidence reposed in him by his client and misappropriated money collected for the client and used it for purposes not authorized by the terms of his trust.

With respect to the second item of complaint, the trial committee recommended that a reprimand be imposed upon respondent, and that, as to the first and third items of complaint, respondent be permanently disbarred from the practice of law in the state of Washington.

On November 2, 1958, after receiving copies of the findings and conclusions and notices of the action of the trial

committee, respondent wrote to the association, in part, as follows:

"I was shocked to learn that the committee had found me guilty of having committed 'acts of moral turpitude'. I am numbed at the realization that the committee has seen fit to recommend that I be thoroughly & permanently disbarred from the practice of law.

"I must say that I am more resentful of the committee's finding of moral turpitude than I am of its recommendation for disbarment. Should this seem strange to you, please understand that I have been for the last year effectively 'disbarred' from the practice of law.

"For the record, for this is true, I have not been guilty of any act of moral turpitude, and I emphatically take exceptions to such of those of the committee's findings relating to such issue. Negligent and careless, I may have been; stupid I certainly was; but in all things I have acted in honor for I have broken no confidences (though I have been the victim of more than one broken confidence in this) and I have called no names and I have not attempted to excuse my stupidity.

"Again, for the record—That monies remain owing to Rogers and to Miss Daily is due not to my non-existent moral turpitude, but to the premature and unwise action of Rogers in initiating these proceedings at a time, when combined with other circumstances, made it impossible for me to meet any, I repeat, any, of my obligations then outstanding. Had this not happened neither Rogers nor Miss Dailey would have had any cause for complaint, nor will either, God willing, suffer any permanent monetary loss on account of me."

The board of governors reviewed the record made before the trial committee and its report as provided in Rule for Discipline of Attorneys 43, 34A Wn. (2d) 196, and thereafter transmitted all the pertinent documents to this court, together with the board's report and recommendation wherein it concurred in, and approved of, the committee's recommendation.

Upon the filing thereof in this court, the clerk complied with the provisions of Rule for Discipline of Attorneys 44, 34A Wn. (2d) 196, by mailing a copy of the board's report and recommendation to respondent at his last known post-office address. Respondent did not file any objections to

the board's report and recommendation within thirty days thereafter as required.

On April 1, 1959, the clerk wrote to respondent advising that the matter would be heard by this court on June 24, 1959. On that date, the matter was heard by the court *en banc*. Respondent submitted no brief, and no one appeared to present any oral argument on his behalf.

We have examined the record and are of the opinion that the findings of the trial committee are amply sustained by the evidence. We approve these findings and also the report and recommendation of the board of governors.

Respondent has committed two acts of embezzlement which obviously involve serious moral turpitude and dishonesty. Under Rule for Discipline of Attorneys 10, 34A Wn. (2d) 183, an attorney may be reprimanded, suspended or disbarred for any of the following causes:

"(3) Violation of his oath as an attorney, or of his duties as an attorney and counselor. . . .

"(6) For the commission of any act involving moral turpitude, dishonesty, or corruption, whether same be committed in the course of his relations as an attorney or counselor at law, or otherwise, and whether the same constitute a felony or misdemeanor or not; and if the act constitute a felony or misdemeanor, conviction thereof in a criminal proceeding shall not be a condition precedent to disbarment or suspension from practice therefor. . . .

"(11) Violation of the ethics of the profession. The Code of Ethics adopted by the Supreme Court of the State of Washington shall be the standard of ethics for the members of the bar of this state."

If there were any doubt under the evidence introduced in this proceeding about respondent's being unfit to be permitted to practice law, his unfitness is conclusively demonstrated by his own statements in his letter of November 2, 1958 (quoted above), in opposition to the findings and recommendations of the trial committee. He denies that he has been guilty of any act of moral turpitude, and emphatically takes "exceptions" to the committee's findings "on such issue." He blames his present predicament on the two clients whose money he embezzled. He says that, for

the record, the reason they have not been paid is due *not* to his "non-existent moral turpitude, but to the premature and unwise action of Rogers [his client] in initiating these proceedings at a time, when combined with other circumstances, made it impossible" for respondent to meet *any* of his then outstanding obligations.

Respondent's inability to distinguish between embezzled funds and other financial obligations and his reference to his victimized clients as though they were ordinary creditors stamp him as unfit to be a lawyer. His reference to Mr. Rogers' complaint to the bar association as being "premature" is particularly brazen, since his client's funds were misappropriated in July, 1957. Mr. Rogers was given a check in September on which respondent promptly stopped payment. Thereafter, Mr. Rogers was unable to ascertain where respondent was in spite of his attempts to contact him. Mr. Rogers waited several months without hearing from his lawyer who had in his possession $1,345 which he had embezzled from his client. He then complained to the bar association.

By his conduct, respondent has not only violated all three of the causes for discipline under Rule 10 (quoted above), but also has brought disgrace upon himself and upon the legal profession. The function of this court in disciplinary proceedings of this nature is stated in *In re Beakley,* 6 Wn. (2d) 410, 107 P. (2d) 1097 (1940), and in *In re Park,* 45 Wn. (2d) 383, 274 P. (2d) 1006 (1954). Respondent is obviously unfit to be permitted to continue the practice of law, since he is unable to distinguish between the obligations of a lawyer to his client and those of an ordinary debtor to his creditors.

The report and recommendations of the board of governors of the Washington state bar association in this matter are hereby in all respects approved by this court.

It is, therefore, hereby ordered that respondent, James B. Carroll, with respect to the second item of complaint, be reprimanded by the board of governors, and that he be, and hereby is, permanently disbarred from the practice

of law in the state of Washington; and that his name be stricken from the roll of attorneys.

ALL CONCUR.

ROSELLINI, J. (concurring)—I concur with the majority, and wish to discuss the broader implication of the problem of a lawyer's embezzling funds from a client.

Even though only an infinitesimally small percentage of lawyers ever embezzle funds, it gives the profession a bad name, and the bar as a whole becomes the object of public condemnation.

The state bar is vigorously and vigilantly policing its membership. It recommends disbarment proceedings against an errant member; however, it has not as yet recognized what obligation if any, it has to a victim of defalcation by a lawyer.

In England and in many other common-law countries, the legal profession has voluntarily established "a client's security fund" to reimburse the client when an attorney betrays a trust or misappropriates funds. The creation of such a fund was recognized as "a debt of honor owed by the profession" to the injured person.

The American Bar Association has for many years urged that state bars follow the example of England. Reginald Heber Smith, in 44 American Bar Ass'n Jour., February, 1958, "The Client's Security Fund, A Debt of Honor Owed by the Profession," fully states the arguments in favor of a client's security fund.

The state bar associations of Vermont and Oregon have recently decided to establish such a fund.

Perhaps the time has arrived when we of the legal profession of this state should recognize our obligation to a client who is a victim of defalcation.

HILL, J., concurs with ROSELLINI, J.