[No. C.D. 3378.    En Banc.    March 6, 1975.]

*In the Matter of the Disciplinary Proceeding Against* GEORGE LIVESEY, JR., *an Attorney at Law.*

*Michael E. Jacobsen,* for Bar Association.

*George Livesey, Jr.,* pro se, and *Paul N. Luvera, Jr.,* for respondent.

UTTER, J.—The Washington State Bar Association asks this court to follow the recommendation of its disciplinary board that George Livesey, Jr., be disbarred. The respondent was brought before two panels of the bar association. The first appearance was on November 8, 1973, pursuant to a complaint of the bar association of June 19, 1973, alleging five items of misconduct. The second appearance was on August 14, 1974, pursuant to a complaint alleging three further items. There is no dispute regarding the facts in this case. The findings at the first hearing established the following regarding Mr. Livesey's conduct:

ITEM ONE: In August 1968, Mr. and Mrs. Ray Young retained Mr. Livesey in a real estate matter. They paid him $100 retainer and deposited with him $1,000 earnest money. For 3 years he engaged in negotiations on the Youngs' behalf. He then informed the Youngs that he had filed an action in the matter. No action was filed. Later he told them that trial was set, then that they had won. Finally, he admitted that there had been no action filed, and negotiations were begun between the Youngs and Mr. Livesey's insurance carrier regarding the return of their $1,000.

ITEM TWO: In 1968 Mr. Livesey was retained by Ralph Deckwa in a personal injury action. An action was filed, but then dismissed. Later he misinformed Mr. Deckwa that trial was set, then that the matter was settled for $27,500. Mr. Livesey later paid Mr. Deckwa this amount, considerably more than the claim was worth, out of his personal funds.

ITEM THREE: In 1971 Mr. Livesey was retained by three men in a dispute involving the Lummi Indian Tribe. Between July 1971 and January 1972 he repeatedly made misrepresentations of various facts to these clients, including that an action had been filed on their behalf. Later an action was filed but it was dismissed in June 1972 with

respondent's concurrence. Thereafter he continued his pattern of misrepresentations, finally telling his clients that the action had been dismissed 3 days before, a month after the actual dismissal date.

ITEM FOUR: In 1969 several property owners retained Mr. Livesey. Thereafter he misrepresented to them that an action had been filed, then that a hearing had been set, then that he had met regarding the matter with Senator Warren Magnuson or his staff. He was paid $2,317.50 by these clients; $1,800 of this was returned by him; most of the rest was absorbed by costs.

ITEM FIVE: Mr. Livesey handled the probate of a Frank Sloan. Mr. Sloan's sole asset was a parcel of real property. Mr. Livesey had expended his personal funds since 1963 to pay various delinquent taxes on this property, and in his efforts to sell it for the estate expended $900. He told Mrs. Sloan that the sale would be consummated and she would realize $8,000. It was not, and the property was sold by the county for nonpayment of taxes. Mr. Livesey received $6,950.47 from the county of which he retained $2,950.47 reimbursement for his expenditures, and deposited $4,000 in his law firm trust account. He thereafter misrepresented to Mrs. Sloan's new counsel the amount Mrs. Sloan had realized, failed to render an accounting and failed to keep appointments concerning the matter. Mrs. Sloan finally sued him for recovery of the amount represented to be due her.

The hearing panel found that respondent's misrepresentations in all five of these items constituted dishonesty in violation of DRA 1.1(a) and misconduct in violation of (CPR) DR 1-102(A)(4). It found, in addition, his actions in items 2, 3 and 4 constituted failure to uphold the honor of the profession in violation of former Canon 29. The panel found as to items 2, 3, 4 and 5 that he had neglected a matter entrusted to him and failed to act competently in violation of (CPR) DR 6-101(A)(3), and that in items 3 and 4 he failed to act expeditiously and punctually in violation of former Canon 29. It finally found that in items 1 and 5 he also failed to promptly account for clients' funds in

violation of (CPR) DR 9-102 (B) (4). The recommendation was that respondent be suspended for 30 days and return to practice only if he continued psychiatric treatment, reimbursed clients' losses and submitted to a semiannual review of his files. The disciplinary board adopted these findings, but increased the recommended suspension period to 6 months.

In the interim betweeen the panel and board hearings, respondent engaged in further, similar acts of deception. In August 1974, a second hearing was held at which respondent was charged with three items of misconduct for these acts. The hearing panel found no misconduct as to one of the items. As to the other two, it found the following facts:

ITEM ONE: For some time prior to 1974 Mr. Livesey had represented a Mr. Henderson regarding a purchase and sale. The purchasers failed to comply with the terms of the sale and the property was placed in receivership. A distribution of the funds was made in April 1974, and Mr. Livesey received a check from the receiver for $2,034. He thereafter represented to Mr. Henderson that he would realize $21,000 from the matter, and thereafter repeatedly told Mr. Henderson that a check in that amount had been or would be sent to him. Mr. Henderson was finally sent a check by Mr. Livesey in the amount of $2,034.

ITEM TWO: Mr. Livesey obtained a default judgment for $2,000 in a partnership matter on behalf of Warren Kelley. During April and May of 1974 he repeatedly misrepresented to Mr. Kelley and inquirers on his behalf the arrangements made for collection of the amounts due. He stated incorrectly on several occasions that funds had been received and/or forwarded.

At the hearing on these matters, the panel concluded respondent's misrepresentations constituted dishonesty and misconduct in violation of (CPR) DR 1-102 (A) (4), and that his actions showed a course of conduct demonstrating unfitness to practice law under former DRA 1.1 (m). It recommended that respondent be disbarred on the basis of

these findings and those of the first hearing. The disciplinary board adopted this recommendation.

■ ■ The primary consideration in disbarment proceedings is the protection of the public from persons unfit to practice law. "[I]n connection with the disbarment of an attorney, the principal consideration is not punishment which might well be inflicted for misdeeds, but rather the fitness of the subject to continue in the practice of law and be held 'out to the public as worthy of that confidence which a client is compelled to repose in his attorney.' " *In re Greenwood*, 22 Wn.2d 684, 689, 157 P.2d 591 (1945). The underlying purpose of all attorney disciplinary action is for the protection of the public and to preserve confidence in the legal profession as well as the judicial system. In deciding the nature of proper disciplinary action, we consider the seriousness and circumstances of the offense, the need to avoid repetition, deter others from similar misdeeds, maintain respect for the honor and dignity of the legal profession, and assure that those who seek legal services will be insulated from unprofessional conduct. *In re Smith*, 83 Wn.2d 659, 663, 521 P.2d 212 (1974). The challenge for this court is to fashion a suitable remedy in each case before us to accomplish these goals and insure that individualized justice is dispensed. The action appropriate in a given case can only be determined by its particular facts and circumstances. *In re English*, 64 Wn.2d 129, 132, 390 P.2d 999 (1964); *In re Greiner*, 61 Wn.2d 306, 309, 378 P.2d 456 (1963).

■ There is no question respondent is unable to practice law at the present time. His inability to alter his pattern of conduct requires, for his protection as well as the public's, that he not now practice law. The cause of his problems, however, is not so clear. The report introduced in evidence at the first hearing by a psychiatrist sheds some light on the question:

> Mr. Livesey demonstrates a special form of impulsive thinking. In a situation that is threatening—a client asking whether or not a trial date has been set, for example,

that rather than say "no" and fall in disfavor by the client, the impulsive thinker . . . might quickly say "yes" aware that a date has not been set, not really taking the time to weigh and balance the morality of the question. This would represent thinking "off the top of the head". What is gained by such a lie? Immediate results are gained, the client's favor is gained, the threat of the client's demand is disarmed, the client may be impressed. . . . But in a person aware of the lying, the high price for immediate satisfaction is shame and guilt leading to depression, increased anxiety, reduced efficiency and a more likely need to lie to offset the reduction in efficiency and production.

. . . .
I think that with firm limits, warm support, and environmental modification Mr. Livesey may be able to conquer this problem. . . . Perhaps a recommendation for continued psychiatric care aimed at helping him become more aware of the impulsive thinking trait as well as helping him assess his stresses would fit into the area of support.

The doctor's testimony at the hearing reinforced these statements in his report. The doctor stated:

An interesting thing about Mr. Livesey is he comes across to me as a moral, honest sort of guy who has a set of moral values and scruples and a sense of right or wrong and this is where his lying really doesn't make sense because it is sort of against his value system. . . . I guess my thinking would be that he hasn't really hurt anybody, yes, he has not represented them as he should and he has not held up his professional ethics as he should, but there has never been any sort of intent on his part to hurt anybody. That all the way along the line, it has always been these people that don't have a case anyway, I should have enough guts to tell them that no way are we going to get any money for them on this and just said simply no, I can't represent you. I think instead of being able to say that and saying yes, might even be impulsive. I'll take the case. I think maybe again that this is an example of impulsive thinking. . . . I see him as one who is really not interested in hurting other people. I think he has got a personal problem which he just gets himself in deeper and deeper and is willing to bail himself out at great personal expense, dollar wise.

The doctor, in response to a question about Mr. Livesey's psychiatric treatment, replied: "I think I would be irresponsible to say that the prognosis would be good or very good or excellent. I think that this man—the thing that I would bank on for a good prognosis is the fact that he is really motivated."

Mr. Livesey did not continue to see the psychiatrist after the first hearing. He did not follow a program of psychiatric treatment and the offenses found to have occurred at the second hearing then took place. His failure to do so was clearly to his detriment. If Mr. Livesey cannot motivate himself to participate in a regular course of psychiatric treatment where he actively seeks to deal with the source of his problem, he should be disbarred and removed from the roll of attorneys of this state. If on the other hand, he is able to motivate himself, there is apparently a basis for hope that he can recover.

We are mindful that at this time we are dealing with a man who has an apparent emotional illness. We cannot therefore evaluate his conduct as we would someone who did not suffer from this disability. We can only see, as time passes, whether he is sufficiently motivated to take the steps to progress toward recovery. With this in mind, we order the suspension of the respondent, which is already in effect, for a period of 1 year from the date of filing this opinion. At the end of that time, his counsel is directed to submit to this court and to the bar association a detailed summary of his treatment and a prognosis from his doctor for his recovery. If he has not immediately started and followed a regular course of treatment, we will order his disbarment at the end of that period of time. If he has followed a course of regular treatment, we will evaluate the report received at the end of that time and determine what additional action on the part of this court, if any, will be necessary.

FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, BRACHTENBACH, and HOROWITZ, JJ., and HENRY, J. Pro Tem., concur.